# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# FILED

January 7, 2008

———————

No. 07-10426
Summary Calendar

Charles R. Fulbruge III
Clerk

———————

MARIA ANGIE FUENTES

Plaintiff - Appellant

v.

POSTMASTER GENERAL OF THE UNITED STATES
POSTAL SERVICE, John Potter

Defendant - Appellee

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAR – 4 2008

CLERK, U.S. DISTRICT COURT
By _____
              Deputy

———————

Appeal from the United States District Court
for the Northern District of Texas, Dallas
USDC No. 3:04-CV-1859

———————

Before KING, DAVIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Maria Angie Fuentes brought suit against defendant-appellee Postmaster General of the United States Postal Service, John Potter, alleging that she was subjected to racial and national origin discrimination and retaliation, in violation of Title VII, and age discrimination, in violation of the Age Discrimination in Employment Act.  The district court

———————

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 07-10426

granted summary judgment to the United States Postal Service, dismissing all of Fuentes's claims, and Fuentes appeals the judgment. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-appellant Maria Angie Fuentes—a Hispanic female of Mexican origin over the age of forty—has been employed by defendant-appellee United States Postal Service ("USPS") for over thirty years. In September 1993, Fuentes was appointed manager of the injury compensation unit for the Dallas District of USPS. Fuentes's first human resources ("HR") supervisor was Theodore Faulkner, and during his tenure, he noted that Fuentes failed to properly train her employees and worked long hours because she failed to delegate work. However, Faulker still nominated Fuentes in early 1999 for a "spot award," a discretionary merit-based monetary award, which USPS ultimately did not award to her.

In February of 1999, Thelma Pamplin, a black female, replaced Faulkner and became Fuentes's new HR supervisor. In July of 1999, Pamplin "detailed" Mary Young, a black female HR specialist from the Los Angeles District, to the injury compensation department to assist with the limited duty program. Around the same time, Pamplin ordered a program review of the injury compensation department (the "audit") due to reported problems. During the week of August 16, 1999, the Southwest Injury Compensation Unit conducted the audit, revealing that the department was appropriately staffed based on its current caseload but that clerical assistance and new equipment were needed. The audit also highlighted internal deficiencies caused by a lack of sufficient training, a low team morale, a backlog of cases, poor workload distribution, confusing procedures for claims handling, and time delays. Fuentes was interviewed as part of the audit.

No. 07-10426

After Pamplin received the results of the audit, she sought guidance from a USPS labor relations specialist, J.D. McAlester, regarding disciplining Fuentes. McAlester responded that because many of the recommendations in the audit were not within Fuentes's immediate control as manager, and she had no record of prior discipline, he suggested placing her on a Performance Improvement Plan ("PIP"). However, Pamplin directed McAlester to draft a notice of proposed reduction in grade, although she never issued the notice to Fuentes. Instead, she notified Fuentes on November 19, 1999, that she was being "detailed" to the administrative services department (the "ASD") in the Dallas District. Pamplin never placed Fuentes on a PIP or notified her in writing of the deficiencies in the injury compensation unit. For one year and ten months Fuentes worked in the ASD detail, did not supervise any employees, and had no other managerial duties, yet she was technically still the manager of injury compensation and did not suffer a change in grade or pay.

While Fuentes continued working in the ASD, numerous employees were detailed into the injury compensation unit to act as managers. Young served as the first acting manager, but was replaced by a white woman, Wanda Hull, one month later. In all, five of the acting managers during this time were not black—Hull, Twyla Nolan, Sandra Wagner, Sherry Wilson, and Dan Moon, who was the only male. In January 2000, Denise Cameron, a black female, replaced Pamplin as the injury compensation HR supervisor.

On March 21, 2000, Fuentes filed a worker's compensation claim, based on a hand injury and employment-related stress and depression. Two days later, on March 23, 2000, Fuentes sent a letter to the Southwest area HR manager, Carol Garvey, and the vice president of Southwest area operations, George Lopez, wherein she provided the reasons for her medical issues, most of which

3

stemmed from the audit and her detail into the ASD.[1]   Her workers' compensation paperwork for this claim was not processed for over four months.

On October 31, 2000, Fuentes filed an Equal Employment Opportunity ("EEO") complaint alleging that the Southwest area office of USPS discriminated against her based on race, gender and national origin, and retaliated against her by delaying the processing of her workers' compensation paperwork.

On September 12, 2001, Cameron notified Fuentes via letter to return to her position as manager of injury compensation on September 17, 2001. However, on that date, Fuentes provided Cameron a note, dated September 13, 2001, from a psychologist, Dr. Joyce Sichel, indicating she had been treating Fuentes for work-related depression and anxiety for two years, and Fuentes was unable to return to her position as manager of injury compensation because of the intense anxiety she would likely experience there.[2]   Fuentes requested to remain in the ASD until her EEO complaint or injury claims were resolved, but Cameron denied her request. Four days later, on September 21, 2001, Fuentes's workers' compensation claim for stress was approved by the Office of Workers' Compensation (the "OWC"), which found her unable to perform as the manager of injury compensation.[3]

---

[1] Fuentes asked the Washington, D.C. Injury Compensation Unit to process her claim because, as Fuentes alleged, Arsenia Rhoden, an Injury Compensation Area Analyst in Fuentes's District, along with Pamplin, Young, and her second-line supervisor, Carl January, caused her stress. Specifically, Fuentes alleged that they were responsible for the audit. By letter dated December 11, 2000, USPS challenged Fuentes's claim.

[2] The doctor's note also clarified that Fuentes was first requested to return to her old position as manager of injury compensation. This was unclear in Fuentes's appellate brief and in her response to USPS's summary judgment motion at the district court level. The inference from those filings was that Cameron initially directed Fuentes to return to work in another position, neither related to injury compensation nor to the ASD. It is apparent from the doctor's note, which Fuentes presented herself, that was not initially the case.

[3] On October 23, 2001, Fuentes filed another workers' compensation claim, this time for "neurotic disorders," based on an injury that allegedly occurred on September 12, 2001, the date of Cameron's letter notifying Fuentes to return to her manager position. The OWC

4

No. 07-10426

In November, 2001, Fuentes filed her second EEO complaint alleging that USPS had discriminated against her based on race, gender and national origin and had retaliated against her first on September 12, 2001, when she was presented with a letter directing her to report to another duty assignment, and later on November 16, 2001, when USPS posted Fuentes's manager of injury compensation position as open for bidding.[4]

On December 4, 2001, Fuentes was offered the position of vehicles supplies supervisor, but declined the offer. On April 24, 2002, the OWC notified Fuentes that it found the job to be suitable, and she responded by letter on May 15, 2002, disagreeing with the OWC's findings. The OWC informed Fuentes on June 27, 2002, that the job was suitable despite her objections. On July 11, 2002, she again objected and submitted a letter from her doctor releasing her to return to work as manager of injury compensation with no restrictions. On August 9, 2002, the OWC recommended that a notice of proposal to terminate future compensation benefits be issued because Fuentes had not returned to work despite her medical clearance.

During the months of July through October 2002, Cameron required Fuentes to undergo several examinations meant to gauge her ability to return to work, including two fitness-for-duty examinations and neuropsychological testing. Fuentes filed her third EEO complaint, on October 23, 2002, this time against Cameron and January, alleging that they had improperly refused to permit her to return to work.

---

initially accepted the claim for medical payments only, later rescinded the claim, and officially denied the claim on March 10, 2003.

[4] Beginning on November 14, 2001, Fuentes's job position was posted on the USPS internet site as "vacant" and remained there for at least five days, during which time no eligible employees bid for the job.

No. 07-10426

In mid-November of 2002, Fuentes returned to work as the manager of injury compensation. However, she again held the position in title only, as she was not assigned to perform her previous managerial duties. Instead, she was tasked to lead several projects within the unit. During this time, the Manager of Safety, a black female named Freddy Evans, was also recognized as the acting manager of injury compensation and occupied the physical office formerly assigned to Fuentes. During 2004 and 2005, Fuentes reported to and was evaluated by Evans. On April 1, 2006, Fuentes resumed the duties of managing the injury compensation unit.

On June 26, 2004, Fuentes filed suit against USPS, alleging race, national origin, and age discrimination and retaliation in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII, 42 U.S.C. § 2000(e) *et seq.* USPS moved for summary judgment on all claims on February 28, 2006. After full briefing by the parties, the district court granted the summary judgment motion and entered judgment in favor of USPS on all claims on February 28, 2007. Fuentes filed a notice of appeal on March 30, 2007.

## II. DISCUSSION

We review a grant of summary judgment de novo. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). Summary judgment is proper when the evidence reflects no genuine issues of material fact and the nonmovant is entitled to judgment as a matter of law. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (citing FED. R. CIV. P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We view all evidence in the light most favorable to the party opposing the motion and draw all reasonable inferences in that party's favor. *Id.* (citation omitted).

6

Nevertheless, unsubstantiated assertions are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). The nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Id.* The district courts are under no duty "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

A. *Title VII Claim of Race and National Origin Discrimination*

Fuentes argues that USPS, through its employees Pamplin, Cameron, and January, removed her from her position as manager of injury compensation and reassigned her to several non-managerial positions in an attempt to hire and promote black employees.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove Title VII discrimination through direct or circumstantial evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as here, there is no evidence of direct discrimination, Title VII discrimination claims based on circumstantial evidence are analyzed under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Rutherford v. Harris County*, 197 F.3d 173, 179–80 (5th Cir. 1999). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first present a prima facie case of discrimination. *Id.* To do that, a plaintiff must establish that she: (1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action;

7

and (4) was replaced by someone outside her race or national origin. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007).

Assuming the plaintiff establishes her prima facie case, the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the plaintiff's rejection. *McDonnell Douglas*, 411 U.S. at 802. A defendant must merely set forth, through admissible evidence, "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original).

If the employer meets its burden, then it shifts back to the plaintiff to present substantial evidence that the employer's reason was a pretext for discrimination. *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001). This may be accomplished either directly, by showing that a discriminatory reason more than likely motivated the employer, or indirectly, by showing that the asserted reason is unworthy of credence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citation omitted).

USPS concedes that Fuentes has produced evidence to satisfy the first two elements of her prima facie case, as she is a Hispanic female of Mexican origin who has worked for USPS as manager of injury compensation since 1993. However, USPS argues that Fuentes has shown neither that she suffered an adverse employment action, nor that she was replaced by a person outside her protected class, and thus she fails to establish a prima facie case of race or national origin discrimination.

We have narrowly construed the term "adverse employment action" to include only "*ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (emphasis in original). However, a discriminatory reassignment may also constitute an adverse employment action when it

involves a "major change in compensation, duties, and responsibilities." *Id.* at 282 n.8.

Although Fuentes did not allege that USPS failed to promote her, denied her leave, or discharged her, she claims that in 1999, she was removed from her managerial position and reassigned to work a series of "details" for the next six years. While on detail, Fuentes was no longer responsible for supervising or managing employees, and although her pay grade was unaffected, she became ineligible for merit-based "spot awards." The district court assumed, without deciding, that Fuentes had established an adverse employment action, and that she was replaced by someone who was not of the same race or national origin. We make the same assumptions, arguendo. Accordingly, Fuentes has established her prima facie case of employment discrimination.

We now focus our attention to USPS's proffered legitimate, non-discriminatory reasons for removing Fuentes from her position as manager of injury compensation and reassigning her to various non-managerial positions at the USPS Dallas facility. USPS asserts that Fuentes was originally detailed out of the injury compensation unit because she had documented performance problems in her position as manager, as evidenced by the audit, and became an impediment to necessary changes that were being made to the unit. USPS also points out, for at least part of the time that she was not performing her injury compensation duties—from September 2001 to July 2002—it was solely the result of her own actions, in particular the presentation of her psychologist's letter claiming she could not return to her position as manager of injury compensation because it would be damaging to her mental health. And, after Fuentes's doctor released her as medically ready to return to work, USPS asserts that it did not immediately reinstate her because fitness-for-duty exams were

9

required, in accordance with USPS policy.[5]   Furthermore, due to her nine months paid sick leave and her prior one year ten months detail in the ASD, USPS contends that Fuentes needed to be reacquainted with the complexities of the injury compensation unit before overseeing its day-to-day workings as acting manager.

Under the *McDonnell Douglas* rubric, the burden shifts again to Fuentes, who tries to rebut as pretextual USPS's proffered "performance problems" by arguing that the injury compensation unit's deficiencies were not of her making or in her control to remedy.[6]   Specifically, Fuentes points to McAlester's conversation with, and letter to, Pamplin advising that Fuentes be put on a PIP as evidence that she should not have shouldered the blame for the problems in the injury compensation unit.  Fuentes also contends that her performance was hampered by January and Pamplin because they failed to provide her with proper clerical staff and equipment.  Finally, she charges that the reassignment came soon after she had been recognized nationally for her job performance as the manager of injury compensation, implying that her detail to the ASD was unrelated to her ability to manage.

The district court concluded, and we agree, that Fuentes's summary judgment evidence falls short of proving the pretextual nature of USPS's proffered legitimate non-discriminatory purpose. Fuentes relies on McAlester's letter stating that "many of the recommendations [from the audit were] not within [Fuentes's] immediate control" as the basis for her contention that she was not responsible for the deficiencies highlighted in her unit, and thus should

---

[5] The audit provided that the injury compensation department should more readily utilize fitness-for-duty exams to determine an employee's ability to perform.

[6] We note that Fuentes did not provide summary judgment evidence rebutting USPS's proffered justifications for the reassignments that Cameron, Pamplin's replacement, gave Fuentes after her return from paid sick leave.

No. 07-10426

not have been removed.  However, McAlester only pointed out to Pamplin that *many* (not all) of the *recommendations* (not the deficiencies) were not in Fuentes's immediate control.  McAlester did not address, nor does Fuentes on appeal, any of the audit's findings that were directly related to Fuentes's competence as manager and not the result of poor staffing and equipment.[7] Consequently, we have no reason to conclude that Pamplin did not reasonably rely on those findings as justification for her reassignment of Fuentes.

Moreover, "[w]e do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue." *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).  Even if Fuentes is factually correct that she performed her position well and was nationally recognized for it,[8] the fact that McAlester (whom Fuentes points to) believed in and relied on the veracity of the audit findings to support his recommendation for a PIP is strong evidence that Pamplin also believed the findings and was motivated by them in reassigning Fuentes.  In addition, Pamplin's decision to "detail" Fuentes into the ASD, rather than comply with McAlester's recommendation to implement a PIP,[9] permits at

---

[7] These findings include that: (1) the junior HR specialists had inadequate knowledge of the claims management process, yet Fuentes turned down hands-on training by the Area Analyst, stating her staff was fully trained; (2) Fuentes's decision to not redistribute the workload after a position was vacated resulted in confusion and unnecessary work; (3) Fuentes's failure to require each HR specialist to timely report claim status changes to Safety created a false picture of the district's standing; (4) numerous discrepancies in the continuation of pay files were caused by the lack of uniform tracking by Fuentes and her staff; (5) claims management was too sporadic and reactive, resulting in incomplete follow-up actions taken with cases; (6) Fuentes did not make HR specialists aware of a diskette of letters that would help them to properly correspond with physicians; and (7) Fuentes's routine of providing notations and instructions, such as "see me," on the letters from the OWC before forwarding them to the HR specialists created unnecessary delay and confusion.

[8] Fuentes's averment that she "met her numbers" is belied both by the audit and by the numbers contained in the proposed grade reduction McAlester prepared, which Fuentes provided as part of her summary judgment evidence.

[9] On the other hand, Pamplin partially accepted McAlester's recommendation with her decision to not issue the proposed grade reduction to Fuentes.

most a "tenuous inference of pretext," and therefore, no genuine issue of material fact remains. *See Crawford*, 234 F.3d at 903 ("It is[ ] possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination"); *see also Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997) ("[I]f the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a jury cannot reasonably infer discriminatory intent.").

As Fuentes neither provides direct evidence of discrimination, nor sufficient evidence of pretext, we uphold the dismissal of this claim.

B. *Title VII Claim of Retaliation*

Fuentes also asserts that USPS retaliated against her for engaging in protected activity. On appeal, Fuentes pinpoints two allegedly retaliatory actions. First, Fuentes claims that USPS removed her from her detail in the ASD and directed her to another duty assignment just two days before an EEO mediation session. Second, Fuentes alleges that USPS did not immediately permit her to return to work after she was medically cleared by her doctor.

To establish a prima facie case of Title VII retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. *Turner*, 476 F.3d at 348. We have defined "protected activity" as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted). The Supreme Court recently clarified that an "action" may be deemed "adverse" where "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge

of discrimination." *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (internal quotations and citations omitted).

Once the prima facie case is established, the burden of producing some nondiscriminatory reason falls upon the defendant. *See EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1326 (5th Cir. 1991) (citation omitted). The employee then assumes the burden of showing that the reasons given were a pretext for retaliation. *Id.*

Here, Fuentes has met the first prong of her prima facie case, namely, the evidence of the EEO charges she filed—a protected activity. Further, her assertion that she was not permitted to return to her job as manager of injury compensation after medical clearance constitutes a materially adverse employment action.[10] Thus, the final issue is whether Fuentes has established a causal link. We need not answer this question, however, because even if Fuentes could make the necessary prima facie case, she cannot prove that USPS's proffered legitimate, non-retaliatory reasons are pretextual.

USPS explains that Fuentes remained off work for several months after having been fully cleared to return because, pursuant to company regulations, Fuentes was required to undergo fitness-for-duty exams. These exams would determine whether Fuentes was mentally healthy to return to her position as manager after being away nine months due to work-related stress and anxiety. USPS additionally offers that Fuentes had to be reacquainted with the complexities of the injury compensation unit because of her extended leave—her

---

[10] However, we do not find an adverse employment action in Fuentes's first claim contending that because Cameron directed her on September 12, 2001, to return to the position of manager of injury compensation, effective September 17, 2001, she suffered retaliation. This is nonsensical; there is no adverse action in requesting her to return to the job that she was being paid to do, especially when her initial removal from that very job is the basis of her complaint of discrimination. A reasonable employee would not have found this action materially adverse. Similarly, after Fuentes provided the doctor's note indicating that she could not return as manager of injury compensation, Cameron's responding offer of a different position to Fuentes fails to be adverse.

No. 07-10426

detail into the ASD coupled with her paid sick leave for stress. Since Fuentes fails to point to any evidence to prove that USPS's justifications are merely pretexts for retaliation, we conclude that the district court's grant of summary judgment in favor of USPS was appropriate.

### C. ADEA claim of Age Discrimination

Finally, Fuentes alleges that USPS discriminated against her based on her age. Fuentes relies on the same employment actions that she asserted in her claim of race and national origin discrimination under Title VII, namely, the reassignments by HR supervisors into non-managerial positions. The *McDonnell Douglas* framework also applies to an age discrimination claim. *See Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005). Therefore, even if we were to find that Fuentes presented a prima facie case of age discrimination, her claim would fail, because, as we previously held, she failed to provide substantial evidence of pretext in response to USPS's proffered legitimate, non-discriminatory reasons for her reassignments.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.